**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR ALPHA BANK & TRUST, | : : : : | |
| | : | CIVIL ACTION NO. |
| Plaintiff, | : | 1:11-CV-3423-RWS |
| | : | |
| v. | : | |
| | : | |
| JAMES A. BLACKWELL, et al., | : | |
| | : | |
| Defendants. | : | |

**ORDER**

On April 22, 2013, the Court held a hearing to address discovery issues

that have arisen between the parties.  After reviewing the record and

considering the arguments of the parties, the Court enters the following Order,

memorializing certain agreements between the parties and ruling on the issues

that remain before the Court.

1.    Defendants' Motion to Compel Non-Party Department of Banking

& Finance to Comply with Subpoena [64] has been **WITHDRAWN**.

2.    Defendants' Motion for Sanctions [110] has been

**WITHDRAWN**.

AO 72A
(Rev.8/82)

3.      Plaintiff's Motion for Protective Order [54] is **GRANTED**.

4.      Plaintiff's Motion for Protective Order [65] and Supplemental

Motion for Protective Order [123] are **DENIED**[1] for the reasons that follow.

      *i.      The Parties' Arguments*

Plaintiff moves for a protective order to prevent Defendants from

seeking discovery related to (1) alleged acts or omissions of the FDIC acting in

its regulatory capacity ("FDIC-Corporate") and (2) Plaintiff's alleged failure to

mitigate damages when it liquidated the failed bank's assets.  (See generally

Pl.'s Mot. for Protective Order, Dkt. [65].)  Plaintiff argues that this discovery

pertains to certain of Defendants' Affirmative Defenses, which Plaintiff argues

fail as a matter of law.

In particular, Plaintiff argues that discovery related to FDIC-C's pre-

receivership conduct pertains to Defendants' Affirmative Defenses of estoppel

(Fifth); contributory negligence (Sixth); that "[FDIC-C]'s own pre-receivership

actions and/or omissions were the proximate cause of its alleged loss" (Ninth);

---

[1]At the hearing, counsel reached agreement regarding several of the discovery requests addressed in these motions and in Defendants' Motion to Compel [73].  The terms of the agreement were stated on the record, and the Parties are **ORDERED** to comply with the agreement.

2

"reasonable reliance on bank examiners" (Fourteenth); and waiver

(Eighteenth).  (See generally id.)  Plaintiff contends that these affirmative

defenses fail as a matter of law, and therefore cannot support the requested

discovery, for two reasons:  First, Plaintiff argues that FDIC-C and Plaintiff

(FDIC-R) are distinct legal entities, thus precluding the conduct of the FDIC-C

from serving as a defense to Plaintiff's claims.  (Id. at 2-3, 7-8, 8-10.)  Second,

Plaintiff argues that under the federal common law "no duty" rule, FDIC-C

owed no duty to Defendants, precluding its conduct from serving as a defense

to Plaintiff's claims.  (Id. at 8, 10-16.)  Defendants' Tenth Affirmative Defense

is based on the allegation that Plaintiff failed to mitigate damages when it

liquidated the Bank's assets.  Plaintiff argues that this defense fails as a matter

of law because Plaintiff, like the FDIC-C, owed no duty to Defendants and

therefore was under no obligation to mitigate damages.  (Id. at 16.)

Defendants respond to these arguments as follows.  With respect to

discovery related to FDIC-C's pre-receivership conduct, Plaintiff argues this

discovery is permissible because it pertains not only to Defendants' affirmative

defenses but also to Plaintiff's claims.  (Defs.' Br. in Opp'n to Pl.'s Mot. for

Protective Order ("Defs.' Br."), Dkt. [72] at 13-15.)  In this regard, Defendants

3

point to the allegations in the Complaint that Defendants "disregarded the advice . . . of <u>regulators</u> designed to assist them in their decision-making with respect to the Bank's lending policies." (<u>Id.</u> at 3 (emphasis in original) (citing Compl., Dkt. [1] ¶¶ 42(d), 71).) Defendants argue, "FDIC-R [Plaintiff] . . . contends that regulators gave warnings that the Bank failed to heed. In actuality, there were no material warnings, and the Defendants seek discovery to establish that fact." (<u>Id.</u> at 6.) (As discussed below, Defendants also argue that the "no duty" rule does not apply to bar this discovery. (<u>Id.</u> at 15-23.).)

With respect to discovery related to Plaintiff's alleged failure to mitigate damages, Defendants contend that this discovery is permissible because the "no duty" rule does not apply in cases, such as this one, brought under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). (<u>Id.</u> at 15-23, 24-25.) Defendants also argue that Plaintiff's duty to mitigate damages can be found in FIRREA itself, which provides, in pertinent part, as follows:

(E)    Disposition of Assets

In exercising any right, power, privilege, or authority as . . . receiver in connection with any sale or disposition of assets of any insured depository institution for which the Corporation has been

4

appointed . . . receiver . . . the Corporation shall conduct its operations in a manner which—

    (i)     maximizes the net present return from the sale or disposition of such assets; [and]

    (ii)    minimizes the amount of any loss realized in the resolution of cases[.]

(Id. at 24 (citing 12 U.S.C. § 1821(d)(13)(E)).)

        *ii.*    *Analysis*

The Court finds that Defendants are entitled to discovery regarding the pre-receivership conduct of the FDIC-C, as such discovery relates directly to Plaintiff's claim that Defendants "rejected or disregarded the advice of third parties and regulators designed to assist them in their decision-making with respect to the Bank's lending policies" (Compl., Dkt. [1] ¶ 71). Moreover, as explained below, the Court finds that the "no duty" rule is inapplicable in this FIRREA case and therefore does not bar this discovery.

The Court also finds that Defendants are entitled to discovery regarding Plaintiff's alleged failure to mitigate damages when it disposed of the Bank's assets. In reaching this conclusion, the Court finds that the federal common law "no duty" rule invoked by Plaintiff does not bar this discovery or

5

Defendants' affirmative defenses based on this allegation.[2]  On the contrary,

the Court finds that the "no duty" rule is no longer applicable in FIRREA cases

in light of the United States Supreme Court's decision in <u>O'Melveny & Myers</u>

<u>v. FDIC</u>, 512 U.S. 79, 85-87 (1994).

In <u>O'Melveny</u>, the FDIC, in its capacity as receiver for a failed bank,

brought a lawsuit against O'Melveny & Meyers, the law firm that had

represented the bank in two real estate transactions.  <u>Id.</u> at 81.  The FDIC

alleged that O'Melveny & Meyers had been negligent and breached its

fiduciary duties to the bank by failing to inquire into the bank's financial status.

<u>Id.</u>  Through fraud, the owners of the bank had disguised the bank's negative

net worth.  <u>Id.</u>  O'Melveny & Meyers moved for summary judgment, arguing

that the FDIC was estopped from pursuing its claims because, under California

law, the owners' knowledge of their fraudulent conduct must be imputed to the

---

[2] The "no duty" rule has been explained as follows: "The thrust of the no-duty rule is that any affirmative defense calling into question the pre- or post-bank closing actions of the FDIC are insufficient as a matter of law because FDIC owes no duty to the officers and directors of a failed bank, either in its pre-failure regulation of a bank or in its post-failure liquidation of same."  <u>Resolution Trust Corp. v. Mass. Mutual Life Ins. Co.</u>, 93 F. Supp. 2d 300, 304 (W.D.N.Y. 2000) (citation omitted).  <u>See</u> <u>FDIC v. Bierman</u>, 2 F.3d 1424, 1439-40 (7th Cir. 1993) (applying "no duty" rule to bar affirmative defenses against FDIC); <u>FDIC v. Mijalis</u>, 15 F.3d 1314, 1324 (5th Cir. 1994) (same).

6

bank and therefore to the FDIC, which, as receiver, stood in the shoes of the bank. Id. at 82-83. The FDIC argued that federal common law preempted the state law of imputation as applied to the FDIC suing as receiver. Id. at 83, 85.

The Supreme Court rejected the FDIC's argument and held that California law, rather than federal common law, determined whether the bank officers' knowledge of their fraud could be imputed to the FDIC suing as receiver. Id. at 89. The Court divided its reasoning into two parts, the first assuming that FIRREA governed and the second assuming that it did not.[3] It is undisputed that FIRREA is applicable in this case. Thus, only the first part of the O'Melveny analysis is applicable here.

In the first part of its analysis, the Court rejected the FDIC's argument that FIRREA evinced a "high federal interest" in the FDIC's receivership of failed financial institutions, thus "confirm[ing] the courts' authority to promulgate [common law to supplement or modify FIRREA]." Id. at 86. The Court found this argument "demolished by those provisions of FIRREA which

---

[3] It was not clear in O'Melveny that FIRREA applied, as the statute was enacted into law in 1989 while the FDIC took over as receiver in 1986. 512 U.S. at 87. Thus, the Supreme Court was "reluctant to rest [its] judgment on FIRREA alone . . . ." Id. In both parts of its analysis, the Court concluded that state law, rather than federal common law, governed the issue of imputation.

AO 72A
(Rev.8/82)

specifically create special federal rules of decision regarding claims by, and

defenses against, the FDIC as receiver." Id. (citation omitted).)  Invoking the

doctrine of "inclusio unius, exclusio alterius," the Court refused to apply the

federal common law rule urged by the FDIC, holding that "[t]o create

additional 'federal common-law' exceptions [to the extensive framework of

FIRREA] is not to 'supplement' this scheme, but to alter it." Id. at 87.  See

also id. at 85 ("[W]e [will not] adopt a court-made rule to supplement federal

statutory regulation that is comprehensive and detailed; matters left

unaddressed in such a scheme are presumably left subject to the disposition

provided by state law.").

Following O'Melveny, some courts have decided that the "no duty" rule

is inapplicable in FIRREA cases.  See, e.g., FDIC v. Skow, No. 1:11-cv-01111

(N.D. Ga. Aug. 14, 2012) (declining to apply "no duty" rule in FIRREA case

following O'Melveny); Mass. Mut. Life Ins. Co., 93 F. Supp. 2d at 306 ("This

court agrees with the holdings [of other cases], where those courts logically

concluded that O'Melveny effectively ended the use of federal common law in

cases governed by FIRREA."); FDIC v. Gladstone, 44 F. Supp. 2d 81, 86 (D.

Mass. 1999) (holding that after O'Melveny, FDIC may not rely on federal

common law "no duty" rule to "insulat[e] it from affirmative defenses attacking

its own conduct"); FDIC v. Ornstein, 73 F. Supp. 2d 277, 282 (E.D.N.Y. 1999)

(holding "no duty" rule was undermined by O'Melveny); Resolution Trust

Corp. v. Liebert, 871 F. Supp. 370, 373 (C.D. Cal. 1994) ("The 'no duty' rule is

clearly a federal common law rule which has been engrafted by federal courts

onto the statutory scheme of FIRREA, and the supplementation or modification

of this statutory scheme by federal common law in this manner is inappropriate

. . . [T]he federal 'no duty' rule does not survive the Supreme Court's

O'Melveny decision, and does not apply to post-FIRREA suits.") (internal

quotations and citation omitted).  The Court agrees with these cases and holds

that the federal common law "no duty" rule has no applicability in FIRREA

suits and therefore does not bar Defendants' affirmative defenses or the

discovery they currently seek.  See also FDIC v. Willetts, 882 F. Supp. 2d 859,

870 (E.D.N.C. 2012) (denying FDIC's motion to strike affirmative defenses on

basis of "no duty" rule in light of split of authority as to whether "no duty" rule

survived O'Melveny and absence of controlling circuit precedent on the issue);

FDIC v. Spangler, No. 10-cv-4288, 2012 WL 5558941, at *5 (N.D. IL. Nov.

15, 2012) (denying FDIC's motion to strike affirmative defenses on basis of

"no duty" rule in light of O'Melveny and its progeny and despite Seventh

Circuit's decision in Bierman (discussed in footnote 2, supra)).

The Eleventh Circuit's decision in Motorcity does not alter the Court's

conclusion that the federal common law "no duty" rule does not apply in

FIRREA suits.  In Motorcity, the Eleventh Circuit held that FIRREA did not

preempt the federal common law D'Oench doctrine.[4]  Motorcity of

Jacksonville, Ltd. v. Se. Bank, N.A., 83 F.3d 1317, 1334 (11th Cir. 1996),

vacated & remanded for further consideration, 519 U.S. 1087 (1997), reinstated

& reaffirmed, 120 F.3d 1140 (11th Cir. 1997).   In reaching this decision, the

Eleventh Circuit construed O'Melveny narrowly as holding that federal courts

may not create new federal common law; thus, the Court reasoned, the

O'Melveny analysis does not govern the question of whether Congress

intended to preempt previously-established federal common law.  Id. at 1330.

Unlike the D'Oench doctrine at issue in Motorcity, it is far from clear to

the Court that the "no duty" rule is a well-established federal common law rule

that pre-existed the enactment of FIRREA.  As one court explained,

---

[4] See D'Oench, Duhme & Co. Inc. v. FDIC, 315 U.S. 447 (1942).

10

> [T]here is a significant difference between the <u>D'Oench</u> doctrine
> upheld in [<u>Motorcity</u>] and the freedom from affirmative defenses
> based on FDIC action [i.e., the "no duty" rule]. The <u>D'Oench</u>
> doctrine was articulated by the Supreme Court in 1942; the
> doctrine the FDIC relies on here was at most the majority rule in
> the 1990's, growing as it has from an unpublished district court
> opinion in 1988.

<u>Gladstone</u>, 44 F. Supp. 2d at 86 n.8. Thus, <u>Motorcity</u> does not change the

Court's conclusion that the "no duty" rule is inapplicable in FIRREA suits

following the Supreme Court's decision in <u>O'Melveny</u>. The Court finds this

result not only compelled by <u>O'Melveny</u> but also to comport with the text of

FIRREA itself, which, as stated above, requires the FDIC acting as receiver to

conduct its affairs in a manner that "maximizes the net present return from the

sale or disposition of such assets" and "minimizes the amount of any loss

realized in the resolution of cases." 12 U.S.C. § 1821(d)(13)(E). Accordingly,

the "no duty" rule is not a bar to the discovery Defendants seek.

   5.   For the reasons stated in paragraph 4, <u>supra</u>, Defendants' Motion

to Compel Plaintiff to Respond Fully to Discovery [73] is **GRANTED**[5].

---

[5]See note 2, <u>supra</u>.

11

6.     Plaintiff's Motion to Compel [92] is **GRANTED in part** and

**DENIED in part**.[6]  The Court finds that Interrogatories 11 and 12 are overly

broad and, therefore, that Defendants are under no obligation to answer them.

To this extent, Plaintiff's Motion to Compel [92] is **DENIED**.  The parties,

however, are encouraged to meet and confer to narrow the scope of

Interrogatories 11 and 12.  In all other respects Plaintiff's Motion to Compel

[92] is **GRANTED**.  With respect to Plaintiff's Requests for Production Nos.

22, 23, and 24, which seek documents related to insurance coverage,

Defendants shall raise objections in accordance with the ordinary rules of

discovery and shall disclose to Plaintiff's any documents that are withheld, and

the legal basis for the withholding, in a privilege log.

7.     Defendants' Motion to Compel Plaintiff to Produce Documents

That It Has Agreed to Produce But Has Failed to Produce [95] is **GRANTED**.

The Court hereby adopts the Order Establishing Protocol of Electronically

Stored Information entered in <u>FDIC v. Baker</u>, Case No. 1:12-CV-4173-RWS,

---

[6] As a threshold matter, the Court does not find that Plaintiff necessarily has
exceeded the twenty-five interrogatories permitted by Federal Rule of Civil Procedure
33(a)(1).  To the extent Plaintiff has exceeded this number, however, the Court will
permit Plaintiff to propound the additional interrogatories.

AO 72A
(Rev.8/82)

N.D.Ga. April18, 2013 [Dkt. No. 20], a copy of which is attached hereto as

Exhibit A.[7]  The Order shall govern production of electronically stored

information in this case.

      8.      The Court will **RESERVE RULING** on Plaintiff's Consent

Motion to Stay Dispositive Proceedings [122].

      9.      Discovery is extended through August 9, 2013.

      **SO ORDERED**, this ___7th___ day of May, 2013.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

---

    [7]Exhibit B to the <u>Baker</u> Order is omitted because it is solely related to specific materials in the <u>Baker</u> case.

13

EXHIBIT "A"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

FEDERAL DEPOSIT                      :
INSURANCE CORPORATION,               :
as Receiver for First Security       :
National Bank,                       :
                                     :    CIVIL ACTION NO.
     Plaintiff,             :    1:12-CV-4173-RWS
                                     :
v.                                   :
                                     :
DAN R. BAKER, *et al.*,              :
                                     :
     Defendants.            :

## ORDER ESTABLISHING PROTOCOL FOR  PRODUCTION OF ELECTRONICALLY STORED INFORMATION

Having considered the proposed protocols regarding electronically stored information ("ESI") submitted by the Parties, as well as the arguments of counsel presented at the hearing held April 8, 2013, the Court enters the following Order establishing the protocol for the production of ESI.

1.    On December 4, 2009, First Security National Bank ("FSNB" or "the Bank") was closed by the Office of the Comptroller of the Currency ("OCC"), and the Federal Deposit Insurance Corporation, as Receiver for First Security National Bank, ("FDIC-

R") was appointed as Receiver. As used herein, "FDIC-R" or

"Plaintiff" means FDIC-R in its capacity as Receiver of FSNB, and

"Defendants" shall mean collectively the D&O Defendants.[1]

2.     This Protocol applies to the ESI provisions of FED. R. CIV. P. 16,

26, 33, 34, and 37. As used herein, the words "Party" or "Parties"

include Plaintiff and Defendants.

3.     In this Protocol, the following terms have the following meanings:

    a.     "Metadata" means: (i) information embedded in a Native

File that is not ordinarily viewable or printable from the

application that generated, edited, or modified such Native

File; and (ii) information generated automatically by the

operation of a computer or other information technology

system when a Native File is created, modified, transmitted,

deleted, or otherwise manipulated by a user of such system.

Metadata is a subset of ESI.

---

[1] Dan R. Baker ("Baker"), Ralph N. Barber, Jr. ("Barber Jr."), Ralph N. Barber, Sr. ("Barber Sr."), John A. Conway ("Conway"), Jerry G. Gardner ("Gardner"), Carl Howington ("Howington"), and John R. Smith ("Smith"). 3

b.  "Native File(s)" means ESI in the electronic format of the application in which such ESI is normally created, viewed, and/or modified. Native Files are a subset of ESI.

c.  Static Image(s)" means a representation of ESI produced by converting a Native File into a standard image format capable of being viewed and printed on standard computer systems. In the absence of agreement of the Parties or order of Court, a Static Image should be provided in Tagged Image File Format (TIFF, or .TIF files). If a TIFF or .TIF file cannot be created, then the Static Image should be provided in Portable Document Format (PDF). If load files[2] were created in the process of converting Native Files to Static Images, or if load files may be created without undue burden or cost, load files shall be provided as set forth in Exhibit "A".

---

[2]A "load file," as that term is used herein, refers to the file necessary to load data into a reviewable database. A load file can, for example, specify what individual pages belong together as a document, what attachments are included with a document, where a document begins and ends, and what metadata is associated with a document.

3

4.    The provisions set forth in Exhibit "A" shall govern the production of ESI.

5.    FDIC-R or its contractors are in possession of certain ESI related to FSNB (the "FSNB ESI"). The FSNB ESI includes the following databases, a list of which is attached hereto as Exhibit "B". FDIC-R represents that the FSNB ESI listed on Exhibit "B" is a complete and accurate listing of all FSNB ESI obtained from FSNB by FDIC-R. Subject to the terms of this ESI Protocol and the proposed Protective Order, FDIC-R shall process and produce any and all documents to Defendants in accordance with the procedure set forth in this ESI Protocol in the format specified in Exhibit "A".

6.    FDIC-R shall produce the FSNB ESI in two phases. Phase I will focus on targeted sets of documents not amenable to search terms. Phase II shall include additional designated ESI and search terms based on the information produced in Phase I.

7.    In Phase II, Defendants shall collectively identify a reasonable set of search terms to run across the FSNB ESI. Thereafter, the Parties shall meet and confer in good faith to establish agreed search

4

terms. In order to facilitate the good faith negotiation of search terms between the FDIC-R and Defendants, FDIC-R shall provide search term hit reports to Defendants which identify the number of unique documents which hit upon each identified search term requested by Defendants. FDIC-R shall also identify in the hit reports the number of family members for the unique hits, and the parties shall work in good faith to arrive at a mutually agreeable set of search terms. If the Parties are unable to agree upon a final set of search terms after conferring in good faith, any Party may raise the issue with the Court by motion. After the Parties have agreed upon search terms, or established search terms with the assistance of the Court, FDIC-R shall apply the search terms to filter the ESI and export to a Relativity database the documents captured by the agreed upon search terms.

8.   Defendants shall be granted access to the Relativity database to enable them to inspect documents and designate the documents they wish to have produced.  After Defendants review the documents, Defendants may request a second round of email

AO 72A
(Rev.8/82)

search terms utilizing the same protocol set out in Paragraph 7 hereof.[3] FDIC-R shall produce non-privileged documents designated for production by each Defendant, and log any document reasonably believed not discoverable because it is privileged, subject to the work product doctrine, non-responsive, or otherwise not discoverable.

9.    Defendants are in possession of certain ESI, including, without limitation, email and documents of various types. Defendants, at their own expense, shall identify and produce non-privileged ESI that is responsive to Plaintiff's discovery requests in the format specified in Exhibit A.  Defendants shall log any document reasonably believed to be not discoverable because it is privileged, subject to the work product doctrine, or otherwise not discoverable on the basis of a recognized protection or privilege.

10.    Producing any ESI for inspection shall be without prejudice to any claim that such ESI is protected by the attorney-client privilege,

---

[3]By agreement of the Parties, additional iterations of search terms may be run to assure identification of relevant documents.

6

work product doctrine, or any other applicable privilege or ground for withholding production. Upon demand, the receiving party shall return any such inadvertently produced ESI and all copies of such ESI to the producing party. To the extent that the parties disagree over the application of these principles to any such production or challenge the privileged nature of such material, the receiving party shall not make use of the material in question until the matter is resolved by the Court.

11.   In accordance with Federal Rule of Evidence 502(b), no party shall be deemed to have waived its right to assert the attorney-client privilege and/or attorney work-product privilege (collectively "Privilege") if Privileged materials are inadvertently disclosed despite the parties' exercise of a reasonable standard of care with respect to the production of such materials. Upon the discovery by any party of an inadvertent disclosure of materials protected by Privilege, in accordance with Federal Rule of Civil Procedure 26(b)(5)(B) that party shall promptly notify the other counsel in writing of the disclosure, identify the document that contains such

7

materials, and immediately take steps to preclude further disclosure. In such an event, the party receiving the materials protected by Privilege will return or destroy all copies of identified materials and treat those materials as if they had been initially excluded from production.

12. The return or destruction of a document or materials over which the producing party has asserted a claim of Privilege as set forth above shall be without prejudice to the receiving party's right to seek an order from the Court directing the production of the document on the ground that the claimed Privilege is invalid or inapplicable; provided, however, that mere production of the document or information in the course of this action shall not constitute grounds for asserting waiver of the Privilege.

13. All queries, searches, filters, document review, and other use of Relativity shall be the work product of the attorney/firm working in Relativity and shall not be available to any other party in this case.

8

14.     Nothing in this Protocol requires Plaintiff or Defendants to

produce again information that was produced to the other before

this action was commenced.

**SO ORDERED**, this ___17th___ day of April, 2013.

**RICHARD W. STORY**
United States District Judge

9

## Exhibit A to ESI Protocol

## FDIC-R First Security National Bank v. Dan R. Baker et al.

### Form of Production for Email

All electronic email from Windows-Based ESI ("WESI") shall be produced as Static Images complete with full text extracts and the following fields of metadata, to the extent the metadata is available:

1. Custodian (Name of Custodian from which file is being produced);

2. Other Custodians (Name(s) of custodian(s) who had exact copy of message before de-duplication);

3. Author (FROM field);

4. CC;

5. BCC;

6. Recipient (TO field);

7. Subject

8. MD5 Hash Value or Equivalent;

9. Date Sent (Date the email was sent);

10. Date Received (Date the file was received);

10

11.    Time Sent (Time the email was received);

12.    Time Received (Time the email was received);

13.    File Type (Application used to create the file);

14.    Page Count;

15.    File Ext (Extension for the file);

16.    PST Name (File name);

17.    Body Text (Extracted text);

18.    Bates Begin (Beginning Production Number);

19.    Bates End (Ending Production Number);

20.    Attach Begin (Beginning Attachment Range Number);

21.    Attach End (Ending Attachment Range Number).

Electronic mail shall be produced along with attachments to the extent the message and/or any attachment is responsive, relevant and not privileged. As a general matter, subject to specific review, a message and its attachments(s) shall not be withheld from production based on the fact that one or more attachments are privileged, irrelevant or non-responsive. To the extent the message and/or one or more attachments is privileged or non-responsive, the responsive, non-

11

privileged documents shall be produced along with placeholders indicating whether the individual record was withheld as non-responsive or privileged.

**Form of Production for Other WESI**

All other WESI (including attachments to electronic mail) shall be produced as Static Images complete with full text extracts and the following fields of metadata to the extent the metadata is available:

1. Custodian (Name of Custodian from which file is being produced);

2. Other Custodians (Name(s) of custodian(s) who had exact copy of file before de-duplication);

3. Author;

4. Doc Title (Title of file from properties);

5. Doc Subject (Subject of file from properties);

6. Created Date (Date the file was created);

7. Created Time (Time the file was created);

8. Last Modified Date (Date the file was last modified);

9. Last Modified Time (Time the file was last modified);

10. Last Saved By (Name of user who last saved the file);

11. File Type (Application used to create the file);

12

12.     Doc Type;

13.     Page Count;

14.     File Ext (Extension for the file);

15.     Path (Full path of the original location where the file was located);

16.     MD5 Hash (MD5 hash value of the original native file);

17.      Body Text (OCR for paper data or Extracted text for all ESI);

18.     Bates Begin (Beginning Production Number);

19.     Bates End (Ending Production Number);

20.     Attach Begin (Beginning Attachment Range Number);

21.     Attach End (Ending Attachment Range Number),

**Form of Production for Spreadsheets**

ESI in the form of spreadsheets shall be produced in native format. There will
be a static image placeholder within the final Bates-numbered set, stating that
the document will be produced natively. The file name of the placeholder will
be changed to reflect the static image's Bates number for cross-reference
purposes. These documents will be accompanied with the appropriate load files
indicating a cross reference to the Bates numbered Static Image.

13

## Load Files

All WESI shall be produced along with an IPRO, Opticon, or Summation DII load file indicating Bates numbers and document breaks. Metadata shall be produced in Concordance DAT file format, *DII format and summary text file for Summation,* or XML format and extracted full text shall be provided in TXT file format at the document level. Non-Windows-Based Applications and Data shall be subject to the same production requirements to the extent technically and legally feasible.

## Data Culling

The following file types shall be processed for production:

| Extension | File Type Description |
|---|---|
| cab | Windows cabinet (data will be extracted and container file) |
| csv | Comma Separated Values file |
| dat | Data file |
| dbx | Outlook Express E-mail Folder |
| doc | Microsoft Word |
| doom | Microsoft Word Template |
| docx | Microsoft Word 2007 |
| dxl | Lotus Notes Message File |

14

| | |
|---|---|
| efax | Electronic fax documents |
| email | Outlook Express E-mail Message |
| eml | Outlook Express Saved Mail Messages files |
| emlx | Apple Mail email message |
| htm | Web based Hypertext Markup Language.File |
| html | Web based Hypertext Markup Language File |
| ics | Calendar items in Apple, Mozilla and Google |
| key | Apple Keynote presentation |
| maildb | MSN Mail file |
| mbox | Unix MAC file mailbox |
| mlm | Novell Group Wise saved email message file |
| mdb | Microsoft Access Database |
| mht | Multipurpose Internet Mail Extension |
| mim | Multipurpose Internet Mail Extension |
| mpp | Microsoft Project |
| msg | Outlook Mail Message |
| nsf | Lotus Notes (data will be extracted and container file discarded) |
| ost | Microsoft Outlook Offline folder file (data will be converted, extracted and container file discarded) |
| pbx | Outlook Express message folder file |
| pdf | Portable Document Format File |
| pop | PopMail Messages file |
| pps | Microsoft PowerPoint Show file |
| ppt | Microsoft PowerPoint file |
| pptx | Microsoft PowerPoint 2007 |

15

| pst | Microsoft Outlook personal folder file (data will be extracted and container file discarded) |
|-----|-----|
| rar | WinRAR compressed archive (data will be extracted and container file discarded) |
| rtf | Rich Text Format |
| tif | Tagged Image Format |
| txt | Plain Text File |
| wks | Works Spreadsheet |
| wpd | Corel WordPerfect |
| wps | Microsoft Works Word Processor Document |
| xls | Microsoft Excel |
| xlsx | Microsoft Excel 2007 |
| xml | Extensible Markup Language file |
| xps | XML Paper Specification |
| zip | Zipped Compressed File (data will be extracted and container file discarded) |
| zipx | Extended Zipped Compressed File (data will be extracted and container file will be discarded) |

## **Duplicates**

To avoid the production of more than one copy of a particular unique item, the Parties shall use industry standard MD5 or SHA-1 hash values within (1) all emails identified for production, and (2) all loose files identified for production. The Parties will not de-duplicate attachments to emails against loose files.

16

**Other Methods to Streamline Discovery**

The Parties agree to meet and confer in good faith about any other technology or process that a producing party proposes to use to streamline the culling, review and production of ESI (e.g., email threading, near de-duplication, technology assisted review). The Parties shall make reasonable good faith efforts to resolve any objections to the use of such technology or process before seeking relief from the court.

**Production Media**

Documents shall be produced on external hard drives, readily accessible computer or electronic media, e.g., CDs or DVDs, or by FTP upload ("Production Media"). All Production Media should have the following four directories: (1) IMAGES for the images; (2) DATA for the .dat and .opt files; (3) TEXT for the extracted text/OCR files; and (4) NATIVES for the native Excel files. The Production Media shall identify: (a) the producing party's name; (b) the production date; and (c) the Bates Number range of the materials contained on the Production Media.

17

## Color

Where the original of a produced document is in color, and color is material to the interpretation of the document, the receiving party may request that the document be produced in color (whether electronic or paper).

## Physical Documents

Documents that exist solely in physical hard-copy format shall be converted and produced following the same protocols outlined above. The metadata shall indicate document breaks and identify the custodian from whom the document was collected. The ".tiff" files shall be subject to an Optical Character Recognition ("OCR") process.

## Inaccessible Data

The Parties need not collect documents stored on disaster recovery backup tapes unless a showing of specific need is made.